1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11    DANIEL URIOSTEGUI,                          No.  1:13-cv-00134-LJO-SKO  HC

12                     Petitioner,          **FINDINGS AND RECOMMENDATIONS**
                                            **RECOMMENDING DENIAL**
13            v.                            **OF PETITION FOR WRIT OF**
                                            **HABEAS CORPUS**
14    F. FOULK,

15                     Respondent.

16

17           Petitioner, a state prisoner proceeding *pro se* with a petition for writ of habeas corpus

18    pursuant to 28 U.S.C. § 2254, presents seven grounds for habeas relief, concerning jury

19    instructions, and admission and sufficiency of the evidence.  The Court referred the matter to the

20    Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.  The

21    undersigned recommends that the Court deny the petition.

22    I.    **Factual Background**

23           At about 4:30 a.m. on June 19, 2009, Petitioner and a confederate[1] confronted Vance

24    ///

25

26    _____

27    [1] Petitioner was tried with a co-defendant, Martin Olvera, who was alleged to be the confederate who shot at Officer
      Walker.  The jury convicted Olvera of count 3 (participation in a street gang) but could not agree on whether Olvera
      was guilty of counts 1(attempted murder) and 2 (discharge of a firearm at an occupied vehicle).  Thus, with regard to
28    Olvera, the trial court declared mistrials on those counts.

                                                  1

Walker, an off-duty police officer[2] who was driving his truck down Park Avenue in Merced, California.  After seeing the two men emerging from an alley, Walker slowed, preparing to stop if they decided to cross the street in front of him.  Petitioner stepped in front of Walker's truck, requiring him to stop completely, and the confederate approached the driver's side window and asked for a cigarette.  Petitioner appeared to signal the confederate, using his head and eyebrows.  Walker was alarmed, thinking that he had been set up for a robbery or assault.  Walker did not see a weapon.

As Walker accelerated away, swerving to avoid hitting Petitioner, he heard multiple gunshots.  Although three shots struck and damaged the truck, Walker was not injured.  Later inspection showed that all three shots entered the truck cab near Walker.  After calling 911 from a safe location, Walker returned to the area but could not locate Petitioner or his confederate.

Merced police responded to the scene and began searching for the individuals that Walker described.  Officer DeJong and Sergeant Dash saw Petitioner near an apartment complex in the 3000 block of Park Avenue.  Petitioner fled on foot.  As Officer Padgett chased Petitioner, he encountered Petitioner's co-defendant, Martin Olvera, near the same location.  Olvera's clothes did not match Walker's description, and he did not have a firearm.  After securing Olvera, Padgett rejoined the chase and assisted DeJong and Dash in stopping and arresting Petitioner.  Walker identified Petitioner by his face and voice, but stated that Olvera looked like the other suspect but had different clothing.  Officers then discovered that Olvera was wearing clothing matching Walker's description under an outer layer of baggy clothing.

Earlier that night, Petitioner and Olvera attended a party given by Cameo Vargas, who lived in the apartment complex with her boyfriend, Oscar Damian,[3] and their young daughter.  Vargas, who admitted at trial that she socialized with members of the Norteño gang, recalled that

---

[2] Walker had a firearm in the truck but did not use it during the incident.
[3] Damian was not home the night of the party.

2

everyone was drinking to excess. Although her memory of the timing was uncertain because of her intoxication, Vargas recalled that Petitioner, Olvera, and a third man arrived at 1:00 or 2:00 a.m. and stayed for several hours. At one point, the three men closed themselves in her daughter's bedroom. Vargas ordered them to get out. In Vargas' living room, Petitioner ordered Olvera to give him something, causing an argument. After Petitioner "disrespected" Vargas, she ordered all three men to leave and locked the door behind them. Petitioner, accompanied by Olvera, kicked in the door. Vargas insisted that she had not seen a firearm that night and did not know why one would be found above her daughter's bedroom.

Witness Kathryn Vonsivers, who lived next door to Vargas on the second floor, testified that the party, which had begun on the evening before, became large and noisy, spilling over onto the walkway in front of the apartments. At one point, a fight erupted among Vargas' intoxicated guests. Vonsivers, who could see and hear the guests through her front window, repeatedly asked Vargas to quiet things down.

At about 4:00 a.m., Vonsivers saw three men dressed in white tank tops and jeans leave the party. One man, whom Vonsivers identified as Petitioner, was so drunk that he staggered and had to be helped down the stairs. Vonsivers testified that she had previously seen Petitioner visiting Vargas' apartment.

Shortly thereafter, Vonsivers heard five gunshots. A herd of people ran up the stairs to Vargas' apartment, the door slammed, the music was turned off, and the party became completely quiet. Vonsivers heard something being dragged across the floor of Vargas' apartment.

Shortly thereafter, the SWAT team surrounded the building. Later that morning, police officers searched Vargas' apartment where they discovered a ladder in the child's bedroom closet, leading to the crawl space above. A .38 caliber revolver was found hidden in the crawl space.

3

Officer Joseph Perez, a member of the Merced Police Department's gang violence suppression unit, testified as a gang expert, providing general information about the Norteños. He described Vargas as a Norteño associate, but he was not familiar with her live-in boyfriend Damian. Perez opined that the party was likely a Norteño gang party. Defendant and Perez were known to be active participants in the Norteño gang in Merced County, although Perez did not know them to have previously collaborated in any crime.

Merced Police Lieutenant Trindad also testified as a gang expert, providing background on the Norteño gang and its typical criminal activities. He opined that the gang frequently used firearms as well as using the ruse of asking for a cigarette to distract the target of a robbery or assault. In response to the prosecutor's hypothetical question,[4] Trindad opined that the hypothetical offense would have benefited the gang financially and enhanced the perpetrators' standing in the gang.

## II.   **Procedural Background**

Petitioner and Olvera were charged with (1) attempted premeditated murder (Cal. Penal Code §§ 664 and 187), (2) discharge of a firearm at an occupied vehicle (Cal. Penal Code § 246), and (3) participation in a street gang (Cal. Penal Code § 186.22(a)). In addition, counts 1 and 2 were alleged to have been committed to benefit a street gang (Cal. Penal Code § 186.22(b)), and Petitioner was alleged to have a prior strike conviction (Cal. Penal Code § 667 (b)(i)). With regard to count 1, Olvera was alleged to have personally discharged a firearm (Cal. Penal Code

///

---

[4] "Two Norteño gang members are walking down an alley at the intersection of Park Avenue, a pickup truck is approaching, the truck is driven by an off-duty Merced police officer. The truck slows because gangsters approach the intersection. One gangster continues across the street. That gangster slows his gait in such a way to cause the truck to come to a complete stop. The gangster also stops directly in front of the truck. The other gangster who stayed on the corner of the intersection, called out to the driver of the truck asking for a cigarette. The driver responds he does not smoke. The driver notices the gangster standing in front of his vehicle gesture his head toward the second gangster on the corner. The driver becomes very concerned for his safety and starts to drive away. Immediately his truck is struck with multiple bullets as he hears corresponding gunshots. The driver drives to safety and calls the police." Doc. 22-1 at 13.

§ 12022.53(c)), and Petitioner was charged with having committed an offense in which a participant discharged a firearm (Cal. Penal Code § 12022.53(c) and (e)(1)).

In January, February, and March, 2010, Petitioner and Olvera were tried jointly before a jury in the Merced County Superior Court.  On March 9, 2010, the jury found Petitioner guilty of all three counts and found the special allegations and prior strike conviction to be true.  On March 10, 2010, the Court heard the bifurcated charges of enhancement 4 to count 1 and enhancement 3 to count 2, and found both enhancements to be true.  On May 13, 2010, the court sentenced Petitioner to a prison term of 30 years to life for attempted murder.  (Sentences for the remaining convictions were stayed.)

On April 15, 2011, Petitioner filed a direct appeal to the California Court of Appeals, Fifth Appellate District.  The Court of Appeal affirmed the judgment on December 19, 2011.  The California Supreme Court denied review on March 21, 2012.

On January 25, 2013, Petitioner filed a federal petition for writ of habeas corpus.

**III.    Standard of Review**

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).  Under the statutory terms, the petition in this case is governed by AEDPA's provisions because Petitioner filed it after April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme

malfunctions" in state criminal justice proceedings.  *Id.*  Under AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States."  *Lockyer*, 538 U.S. at 71.  To do so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision.  *Id.*  The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law."  *Id.* at 72.  The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  The federal court must apply the presumption that state courts know and follow the law.  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent.  *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable.  *Harrington*, 562 U.S. at 102.

**IV.    Errors in Jury Instructions**

In grounds 1 and 2, Petitioner contends that in providing CALCRIM 400,  the trial court improperly (1) referred to the natural and probable consequences doctrine, and (2) used the term "equally guilty."  Respondent counters that the trial court's reference to the natural and probable consequences doctrine was not prejudicial and that because of Petitioner's failure to object at trial, he is procedurally barred from raising the "equally guilty" claim.

**A.    The Jury Instructions**

After denying Olvera's motion to dismiss the case, the trial court conducted an off-the-record conference with the prosecutor and defense attorneys to discuss final proposed changes to the jury instructions.  Upon return to the record, the parties' attorneys declined the trial court's invitation to memorialize any objections.  The trial court then presented jury instructions including the following instructions drawn from CALCRIM 400 and 401:

> A person may be guilty of a crime in two ways.  One, he or she may have directly committed the crime.  I will call that person the perpetrator.  Two, he or she may have aided and abetted a perpetrator who directly committed the crime.  *A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.*
>
> *Unless under some specific circumstances[,] if the evidence establishes aiding and abetting of one crime, a person may be found guilty of other crimes that occurred during the commission of the first crime.*  To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that,

number one, the perpetrator committed the crime.  Number two, the defendant knew that the perpetrator intended to commit the crime. Number three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime, and number four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime.  If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abetter.

If you conclude that the defendant was present at the scene of the crime or failed to prevent a crime, you may consider that fact in determining whether the defendant was an aider and abetter. However, the fact that a person is present at the scene of a crime or fails to prevent the crime, does not by itself make him or her an aider and abetter.

RT1030-RT1031 (added emphasis denotes challenged language).

The instructions did not include CALCRIM 403, which addresses the natural and probable consequences doctrine in detail and includes an explanation of target and nontarget offenses.

### B.   Natural and Probable Consequences

Petitioner first contends that the trial court violated his constitutional rights when it referred to the natural and probable consequences doctrine in the statement: "Unless under some specific circumstances[,] if the evidence establishes aiding and abetting of one crime, a person may be found guilty of other crimes that occurred during the commission of the first crime."

#### 1.   Trial Court's Application of State Law Provisions

Under California Law, a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime (the target crime), but also for any other offense (nontarget crime) committed by the confederate as a "natural and probable consequence" of the crime originally aided and abetted. To convict a defendant of a nontarget crime as an accomplice under the "natural and probable consequences" doctrine, the jury must find that, with knowledge of the perpetrator's unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime, the defendant aided, promoted,

8

> encouraged, or instigated the commission of the target crime. The jury must also find that the defendant's confederate committed an offense other than the target crime, and that the nontarget offense perpetrated by the confederate was a "natural and probable consequence" of the target crime that the defendant assisted or encouraged.

*People v. Prettyman*, 14 Cal.4th 248, 254 (1996).

In this case, the prosecution's proposed jury instructions included CALCRIM 403, which addresses the natural and probable consequences doctrine. The defense argued that the facts did not clearly establish what crime Petitioner and Olvera intended to commit when Petitioner stepped into the roadway to stop Walker's truck. The trial court shared the defense's concern.

California law provides:

> [W]hen the prosecutor relies on the "natural and probable consequences" doctrine, the trial court must identify and describe the target crimes that the defendant might have assisted or encouraged. An instruction *identifying* target crimes will assist the jury in determining whether the crime charged was a natural and probable consequence of some other criminal act. And an instruction *describing* the target crimes will eliminate the risk that the jury will indulge in uninformed speculation with regard to what types of conduct are criminal.

*Prettyman*, 14 Cal.4th at 254.

The natural and probable consequences doctrine requires the jury to decide "whether the defendant (1) with knowledge of the confederate's unlawful purpose; and (2) the intent of committing, encouraging, or facilitating the commission of any target crime(s); (3) aided, promoted, encouraged, or instigated the commission of the target crimes. *Id.* at 271. "The jury must also determine whether (4) the defendant's confederate committed an offense other than the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated." *Id.*

Before instructing the jury, counsel and the trial court went off the record to discuss the trial court's proposed final changes to the jury instructions. When they returned to the record, the trial judge stated that he believed he was prepared to provide "an agreed-upon set of instruction" and asked counsel if there were "[a]ny objections, requests for deletions, additions, or other modifications." RT1011. Petitioner's attorney had a question regarding the pre-deliberation

9

1    instructions (CALCRIM 3550), but neither he nor any other counsel raised an issues relating to

2    the aiding and abetting instructions.

3              The trial court then instructed the jury without including the specific instructions on the

4    natural and probable consequences doctrine (CALCRIM 403).  The court did not exclude the

5    provision in CALCRIM 400 that referred to the natural and probable consequences doctrine,

6    however.

7                         **2.       Court of Appeals Decision[5]**

8              The California Court of Appeal agreed that the objected-to provision in CALCRIM 400

9    implicated the natural and probable consequences doctrine and concluded that the trial court

10   erroneously included it, even though the instructions, as actually given to the jury, did not include

11   CALCRIM 403.  As a result, the objected-to provision in CALCRIM 400 became an "abstract

12   instruction," that is, an instruction which is correct in law but irrelevant to the case.  Under

13   California law, a trial court's giving an abstract instruction is error.  Applying California cases,

14   the appellate court wrote:

15                    Nonetheless, giving an irrelevant or inapplicable instruction is
                    generally only a technical error which does not constitute ground
16                    for reversal.  A defendant challenging an instruction as being
                    subject to erroneous interpretation by the jury must demonstrate a
17                    reasonable likelihood that the jury understood the instruction in the
                    way asserted by the defendant.  In evaluating such a challenge, we
18                    must consider whether it is reasonably likely that the trial court's
                    instructions caused the jury to misapply the law or to interpret the
19                    instructions in a way that violated the defendant's rights.  In doing
                    so, we must consider the entire charge to the jury, not just one
20                    particular instruction or part of an instruction.

21                    *People v. Uriostegui*, Doc. 22-1 at 25 (Cal.Ct.App. Dec. 19, 2011)
                    (No. FG060232) (internal quotation marks and citations omitted).
22
              The court concluded that the challenged language in CALCRIM 400 was not prejudicial
23
     under the case's facts and that there was "no reasonable likelihood that the jury misapplied the
24
     language."  *Id.*  The trial court accurately provided instructions on culpability as a direct
25
     perpetrator and as an aider and abetter, accurately explaining the differences between the two
26
     _____
27   [5]  Because the California Supreme Court summarily denied review, the Court must "look through" the summary
     denial to the last reasoned decision, which is, in this case, the opinion of the California Court of Appeal, Fifth
     Appellate District.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).
28

types of culpability. *Id.* at 26. The trial court did not include CALCRIM 403, which addressed the natural and probable consequences doctrine. *Id.*

Closing arguments did not include any comments or statements that implicated the natural and probable consequences doctrine. *Id.* The prosecutor argued that Petitioner and Olvera had planned to ambush the truck but never referred to target and nontarget offenses. *Id.* Notably, he never argued that Petitioner and Olvera had planned a carjacking, robbery, or other specific offense nor suggested that Petitioner did not share Olvera's specific intent to kill. *Id.* Neither defense attorney raised the natural and probable consequences doctrine in their closing arguments; instead, they challenged Walker's description of the shooting and his identification of the suspects. *Id.*

In his appeal, Petitioner argued that the erroneously included paragraph could have led the jury to improperly consider the natural and probable consequences doctrine, based on Walker's description of the actions of Petitioner and Olvera, and his testimony that he feared that he was going to be attacked or robbed of his truck or both. *Id.* The court rejected Petitioner's argument, noting that Walker testified that he did not know whether Petitioner and Olvera sought to "kill me to get my truck or just kill me because they recognized me as an officer." *Id.* The court emphasized that (1) no evidence supported a conclusion that Petitioner and Olvera knew that Walker was an off-duty police officer and (2) Walker's testimony as a whole supported the prosecution's theory that Petitioner and Olvera intended to kill Walker. *Id.* at 26-27.

The court also rejected Petitioner's argument that Lieutenant Trindad's testimony regarding the "cigarette ruse" could have led the jury to apply the objectional paragraph improperly. *Id.* at 27. The court described Trindad's testimony as a whole as being more detailed that simply describing the cigarette ruse as a robbery method and intended to illustrate a means by which gang members could approach a victim and lull him into a sense of false security before committing an assault or a robbery. *Id.* In any case, Trindad's testimony focused on whether the offenses were gang-related. *Id.*

The appellate court concluded:

> The [trial] court's erroneous inclusion of the final paragraph of

1
2
3
4
5
6

> CALCRIM No. 400 was not prejudicial under the circumstances of this case. "Because the parties made no reference to the 'natural and probable consequences' doctrine in their arguments to the jury, it is highly unlikely that the jury relied on that rule when it convicted defendant," and it appears that the jury was persuaded by the prosecutor's argument that defendant encouraged or assisted the gunman to murder the truck's driver, and he was thus guilty of attempted murder as an accomplice to that crime, "not as an accomplice to some other unlawful act of which murder was a natural and probable consequence." (*People v. Prettyman, supra,* 14 Cal.4[th] at p. 273.)

7

Doc. 22-1 at 27.

8
9

### 3.  Review of Jury Instruction Errors

10
11
12
13
14

Neither the state appellate court nor the parties disagree that the trial court erred by including the natural and probable consequences language of CALCRIM 400. This Court is bound by the state court's determination of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Petitioner contends that a constitutional violation arises from the state court's conclusion that the error was harmless.

15
16
17
18
19
20
21

Generally, claims of instructional error are questions of state law and are not cognizable on federal habeas review. "It is not the province of a federal court to reexamine state court determinations of state law questions." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). "The fact that a jury instruction violates state law is not, by itself, a basis for federal habeas corpus relief." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006). "[A] petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997).

22
23
24
25
26
27

To prevail in a collateral attack on state court jury instructions, a petitioner must do more that prove that the instruction was erroneous. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Instead, the petitioner must prove that the improper instruction "by itself so infected the entire trial that the resulting conviction violated due process." *Estelle*, 502 U.S. at 72. Even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

28

1   A federal court's review of a claim of instructional error is highly deferential.  *Masoner v.*

2   *Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993).  A reviewing court may not judge the instruction

3   in isolation but must consider the context of the entire record and of the instructions as a whole.

4   *Id.*  The mere possibility of a different verdict is too speculative to justify a finding of

5   constitutional error.  *Henderson*, 431 U.S. at 157.  "Where the jury verdict is complete, but based

6   upon ambiguous instructions, the federal court, in a habeas petition, will not disturb the verdict

7   unless 'there is a reasonable likelihood that the jury has applied the challenged instruction in a

8   way' that violates the Constitution."  *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000) (quoting

9   *Estelle*, 502 U.S. at 72).

10   Even when the trial court has made an error in the instruction, a habeas petitioner is only

11   entitled to relief if the error "had a substantial and injurious effect or influence in determining the

12   jury's verdict."  *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776

13   (1946)).  A state prisoner is not entitled to federal habeas relief unless the instructional error

14   resulted in "actual prejudice."  *Brecht*, 507 U.S. at 637.  A violation of due process occurs only

15   when the instructional error results in the trial being fundamentally unfair.  *Estelle*, 502 U.S. at

16   72-73; *Duckett v. Godinez*, 67 F.3d 734, 746 (9th Cir. 1995).  If the court is convinced that the

17   error did not influence the jury, or had little effect, the judgment should stand.  *O'Neal v.*

18   *McAninch*, 513 U.S. 432, 437 (1995).

19   Having carefully considered the record as a whole, the Court concurs with the state court's

20   fact finding.  The determination to omit instructing the jury of the natural and probable

21   consequences doctrine reflected the concern of both the trial court and defense attorneys that the

22   record did not establish any target offense of which the shooting at Walker was a natural and

23   probable consequence.

24   In closing arguments, the prosecutor argued that Petitioner and his confederate planned to

25   ambush Walker's truck, but he never referred to target and nontarget offenses nor argued that the

26   defendants had planned to commit another crime.  The defense challenged the sufficiency of the

27   evidence against the defendants, particularly the credibility of various witnesses, and Walker's

28   ///

13

1    testimony about the circumstances of the shooting and his identification of the suspects. It never

2    raised the natural and probable consequences doctrine.

3         Petitioner repeats his argument, rejected by the state court, that the evidence supported a

4    conclusion that Petitioner had no intent to shoot and that Trindad's testimony regarding the

5    "cigarette ruse" indicates no more than an intent to rob. The argument is inconsistent with

6    Petitioner's defense at trial. In his closing argument, Petitioner's trial counsel, Sean Howard,

7    never suggested that Petitioner simply intended to rob Walker. Instead, pointing to evidence and

8    testimony, Howard argued that Petitioner was not involved in the shooting and simply happened

9    to be crossing the street near Walker's truck when the shooting took place. He denied that

10   Petitioner was acting in concert with the shooter, and contended that Petitioner paused in the

11   street in front of Walker's truck because he was intoxicated.

12        Petitioner contends that under the *Chapman*[6] standard, a court evaluating the prejudice

13   resulting from the erroneous inclusion of the last paragraph of CALCRIM 400 would conclude

14   that the provision "create[d] a substantial risk of misleading the jury to the defendant's

15   prejudice." Doc. 1 at 18 (quoting *People v. Rollo*, 20 Cal.3d 109, 123 (1977)). In an AEDPA

16   case, however, the district court must assess the prejudicial impact of constitutional error by

17   applying the more forgiving "substantial and injurious effect" standard set forth in *Brecht* whether

18   or not the state court acknowledged the constitutional error and evaluated it under *Chapman's*

19   "harmless beyond a reasonable doubt" standard. *Fry v. Pliler*, 551 U.S. 112, 120-21 (2007) ("[I]t

20   certainly makes no sense to require formal application of *both* tests (AEDPA/*Chapman* and

21   *Brecht)* when the latter obviously subsumes the former").

22        That the evidence could have supported a conclusion other than that reached by the jury

23   does not mean that the instructional error caused the jury to find Petitioner guilty. Even if the

24   Court accepts Petitioner's argument without question, the evidence could have supported either

25   construction of the evidence. The state court reasonably concluded that the instructional error

26   was harmless.

27   ///

28   ---

[6] *Chapman v. California*, 386 U.S. 18 (1967).

14

1

C.    **Equally Guilty**

2

In his second claim, Petitioner contends that his rights were violated by inclusion of the

3

phrase: "A person is equally guilty of the crime whether he or she committed it personally or

4

aided and abetted the perpetrator who committed it."  The state court found this claim to be

5

procedurally defaulted.

6

A district court cannot hear a federal petition for writ of habeas corpus unless the highest

7

state court had a full and fair opportunity to hear the claim.  28 U.S.C. § 2254(a).  When a state

8

prisoner has defaulted on his federal claim in state court pursuant to an independent and adequate

9

state procedural rule, federal habeas review of the claim is barred unless the prisoner can

10

demonstrate cause for the default and actual prejudice as a result of the alleged violation of

11

federal law, or demonstrate that failure to consider the claims will result in a fundamental

12

miscarriage of justice.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  An adequate rule is one

13

that is "firmly established and regularly followed."  *Id.* (quoting *Ford v. Georgia*, 498 U.S. 411,

14

423-24 (1991)); *Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2003).  An independent rule is

15

one that is not "interwoven with federal law."  *Park v. California*, 202 F.3d 1146, 1152 (9th Cir.

16

2000) (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).  Not having addressed this

17

issue in his traverse, Petitioner did not establish grounds for this Court to hear the petition despite

18

the state court's determination.

19

The court of appeal added that even if this claim were not procedurally defaulted,

20

Petitioner could not prevail under applicable California law.  As previously stated, this Court is

21

bound by the state court's determination of state law.  *Bradshaw*, 546 U.S. at 76; *Estelle*, 502

22

U.S. at 71-72.  "The fact that a jury instruction violates state law is not, by itself, a basis for

23

federal habeas corpus relief."  *Clark*, 450 F.3d at 904.

24

V.    **Walker's Opinion Testimony**[7]

25

As his third ground for habeas relief, Petitioner contends that the trial court erred in

26

admitting the testimony of Walker, a lay witness, that Petitioner's physical movements signaled

27

28

---

[7] Petitioner's heading of this claim, "Exclusion of Eva Miron's Extrajudicial Statement," appears to be an error since the context of the claim solely concerns Walker's testimony.  No one named "Eva Miron" testified at Petitioner's trial.

1   his confederate to attack.  Petitioner contends that since Walker was not an expert witness, the

2   trial court should not have admitted his testimony of what he thought Petitioner and his

3   confederate were doing.

4       After Walker testified that he had stopped his truck to avoid striking Petitioner, who was

5   standing in the street, direct examination continued:

6       Q.      Now what was the—what was [Petitioner] doing at that
        point?

7

8       A.      He was still standing near the right headlight of my vehicle
        and started to turn over his right shoulder and made kind of a heads
        up, kind of a nodding affirmation to the person on the sidewalk.

9

10      Q.      Did that cause you concern?

11      A.      It did.  It caused me great concern.

12      Q.      Why?

13      A.      As a police officer I train in the use of force and firearms
        training and defense tactics.  I believed I was being set up for an
        attack.

14

15      RT295-RT296.

16      Both defense counsel objected (without articulating the grounds of the objection on the

17  record).  The trial court overruled the objection.  The court of appeal found that Walker testified

18  as a percipient witness whose "lay opinion testimony, based on his personal knowledge and

19  experience of the situation, was admissible to describe his interpretation of defendant's subtle

20  physical movements."  Doc. 22-1 at 31.  *See* Evid.R. §§ 702 and 800.

21      Issues regarding the admission of evidence are matters of state law, generally outside the

22  purview of a federal habeas court.  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).

23  "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial

24  fundamentally unfair in violation of due process."  *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir.

25  1995).  "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned

26  review of the wisdom of state evidentiary rules."  *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6

27  (1983).  "Although the [U.S. Supreme] Court has been clear that a writ should be issued when

28  constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at

16

375 . . ., it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101. Since the state appellate court's disposition of Petitioner's appeal was not contrary to or an unreasonable application of Supreme Court precedent, a federal district court may not grant the writ based on the trial court's admission of Walker's testimony.

## VI.    Due Process: Insufficient Evidence

In his fourth and fifth grounds for habeas relief, Petitioner contends that his convictions for (A) attempted murder and (B) shooting into an occupied vehicle should be reversed for insufficiency of the evidence. Respondent disagrees.

### A.    Standard for Reviewing Insufficient Evidence

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998). It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict. *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997). The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the trier of fact could reasonably have reached its verdict. *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991).

### B.    Sufficiency of Evidence of Attempted Murder

"Murder is the unlawful killing of a human being, . . . with malice aforethought." Cal. Penal Code § 187(a). An attempt occurs when a person attempts to commit a crime, but fails, or is prevented or intercepted in its perpetration. Cal. Penal Code § 664. Petitioner contends that no substantial evidence supported a finding that he had the requisite intent to kill Walker.

///

///

1        **1.      State Court Decision**

2        The California Court of Appeals rejected Petitioner's contention that no evidence was

3 presented that Petitioner "actually knew the gunman intended to kill Walker—or that [Petitioner]

4 shared that intent."  Doc. 22-1 at 17.

> To the contrary, there was very strong circumstantial evidence to
> support his conviction as an aider and abettor of attempted murder,
> and that he had knowledge of the gunman's criminal purpose and
> intended to facilitate the gunman's intent to kill.  [Petitioner] and
> Olvera were together at Vargas's apartment in the hours before the
> shooting.  When Walker saw [Petitioner] and Olvera, they were
> walking together out of the alley.  The alley was in the general
> vicinity of Vargas's apartment.  As they approached Park Avenue,
> Olvera stopped on the sidewalk while [Petitioner] slowed his gait,
> walked at an angle into the street, and stopped in front of Walker's
> truck in order to impede his travel.  As [Petitioner] remained in
> front of Walker's truck, Olvera asked if Walker had a cigarette.
> Within seconds, [Petitioner] used his head and body, and he moved
> or gestured toward Olvera's position on the sidewalk.  [Petitioner]
> remained in front of Walker's truck as gunshots rang out from
> Walker's left side.  The first gunshot, which was fired as Walker
> was trying to drive around [Petitioner], hit the driver's side door,
> just above the door handle and below the open driver's window.
> The other gunshots hit the left side of the truck, shattered the
> driver's side mirror, and narrowly missed Walker as he finally
> maneuvered around [Petitioner] and drove away.
>
> There is strong circumstantial evidence that [Petitioner's] conduct
> was part of an orchestrated scheme to intentionally stop the vehicle,
> take the driver by surprise, divert his attention, impede his ability to
> drive away, and keep him within easy range of the gunman, who
> was clearly standing on the left side of Walker's truck.  The nature
> and location of the first shot, fired directly at the driver's door and
> which narrowly missed Walker, provides further circumstantial
> evidence that the gunman intended to kill the driver and the
> [Petitioner] was part of the plan to keep the driver in harm's way
> until their specific intent to kill was accomplished.
>
> [Petitioner] concedes that his conduct of stopping in front of
> Walker's truck and impeding its path could be interpreted as
> encouraging "some criminal action" by a waiting gunman.
> However, [Petitioner] argues it would have been illogical for him to
> stay in the "line of fire" in front of Walker's truck while the
> gunman fired at the vehicle from the left side.  To the contrary,
> [Petitioner's] purposeful conduct of stopping in front of the right
> headlight of Walker's truck, and his continued presence in that
> position as shots were fired, raises the strong inference that
> [Petitioner] knew exactly how and where the gunman was going to
> open fire from the left side—that the gunshots were being aimed
> directly at the driver of the truck and not wildly in the general
> vicinity of the vehicle.  There is no evidence that [Petitioner] ran or
> got out of the line of fire when the shooting started.  Walker

18

believed that [Petitioner] was still standing in front of his truck, and he had to maneuver his vehicle to the left side to avoid [Petitioner] and escape as the shots continued to be fired at his truck. [Petitioner's] conduct undermined any inference that he was surprised or confused by the gunman's actions.

[Petitioner] further argues there was no evidence of [Petitioner's] motive to kill Officer Walker, given the absence of evidence that [Petitioner] and/or Olvera recognized Walker as an officer, While there was no evidence on that particular point, there was substantial evidence that [Petitioner] and Olvera acted in concert and according to a plan to stop a vehicle in the early morning hours, when there were few people or vehicles on the street, and kill the vehicle's driver. It was presumably happenstance that the driver was a law enforcement officer and reacted so quickly to the dangerous situation.

Doc. 22-1 at 16-18.

### 2. Evidence of Petitioner's Knowledge or Intent

Petitioner contends only that "[t]here was no substantial evidence to support a reasonable conclusion that Petitioner intended to kill Walker; knew that codefendant intended to shoot and kill him; or even knew that codefendant had a gun." Doc. 1 at 23. The federal petition includes no specific contentions, such as those presented to the state court (i.e., positioning in front of Walker's truck or gesturing to the gunman).

Considering the evidence in the light most favorable to the prosecution, as *Jackson* requires, the Court agrees with the state court's conclusion that sufficient circumstantial evidence could support the conclusion that Petitioner and his confederate planned to distract and murder a random motorist. Because the jury could reasonably have concluded that Petitioner aided and abetted his confederate by blocking Walker's path of travel, Petitioner's due process rights were not violated by the attempted murder conviction.

### C. Sufficiency of Evidence of Shooting into Occupied Vehicle

"Any person who shall maliciously and willfully discharge a firearm at an . . . occupied motor vehicle . . . is guilty of a felony." Cal. Penal Code § 246. Petitioner contends that "[t]here was insufficient evidence that Petitioner knew that codefendant Olvera possessed a gun and intended to shoot it." Doc. 1 at 23.

///

19

1.      **State Court Decision**

Referring to its analysis of the sufficiency of the evidence to support an attempted murder

conviction, the Court of Appeals wrote:

> Section 246 states that "[a]ny person who shall maliciously and willfully discharge a firearm at an . . . occupied motor vehicle . . . is guilty of a felony . . ." "Section 246 is a general intent crime. [Citation.] As such, the term 'maliciously' in section 246 is defined by section 7, item 4, as 'a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law.'" (*People v. Watie* (2002) 100 Cal.App.4th 866, 879.)
>
> The offense of shooting at any occupied vehicle can be committed without personally using a firearm, i.e., when the defendant has aided and abetted the gunman. (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1531.) "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)
>
> As explained in section 1, *post*, there is strong circumstantial evidence that [Petitioner] acted as part of a concerted plan to stop a vehicle and impede its path, so that the gunman could open fire on the driver. There is no evidence that [Petitioner] was surprised by the gunfire. Instead, [Petitioner] signaled to someone on the left side of Walker's truck, and [Petitioner] remained in front of Walker's vehicle as the shots were fired directly at the driver's door.
>
> Doc. 22-1 at 18-19.

2.      **Evidence of Petitioner's Intent**

In a single paragraph, the petition refers to ground four (sufficiency of the evidence of

attempted murder) and asserts that insufficient evidence supported Petitioner's conviction for

aiding and abetting the gunman's shooting into the driver's side of Walker's truck.

Again evaluating the evidence in the light most favorable to the prosecution, the Court

agrees with the state court's conclusion that sufficient circumstantial evidence could support the

conclusion that Petitioner and his confederate planned to distract and murder a random motorist,

including shooting into his or her occupied vehicle. Because the jury could reasonably have

concluded that Petitioner aided and abetted his confederate by blocking Walker's path of travel,

Petitioner's due process rights were not violated by the conviction for shooting into an occupied vehicle.

**VII.    Hypothetical Question to Gang Expert**

As his sixth ground for relief, Petitioner contends the hypothetical question presented to the expert witness on street gangs violated the holding of *People v. Vang*, 52 Cal.4th 1038 (2011). As a result, Petitioner claims violations off his rights to trial by jury, fair trial, and due process as set forth in the Fifth, Sixth, and Fourteenth Amendments to the Constitution.  Respondent counters that because the U.S. Supreme Court has never addressed this issue, no clearly established federal law governs this issue, and AEDPA precludes federal review.  *See* 28 U.S.C. § 2254(d)(1).

As previously stated, federal habeas courts presume that state courts know and follow the law.  *Woodford*, 537 U.S. at 24.  The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent.  *Baylor*, 94 F.3d at 1325.  In this claim, Petitioner does no more than allege that the state court erroneously applied state law.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes "a highly deferential standard for evaluating state-court rulings," requiring "that state-court decisions be given the benefit of the doubt."  *Woodford*, 537 U.S. at 24 (quoting *Lindh*, 521 U.S. at 333 n. 7. "[F]ederal habeas corpus relief does not lie for errors of state law."  *Estelle*, 502 U.S. at 67 (*citations omitted*).  This claim implicates only the provisions of California state law.  As such, it is not properly addressed as a federal habeas claim.

**VIII.   Sentencing Error**

Finally, in ground seven, Petitioner contends that the state court erred in sentencing Petitioner to a two-year concurrent sentence for active gang participation (count 3).  Respondent's answer does not address this claim.

After reviewing the provisions of Cal. Penal Code § 654 and California cases applying that statute, the state court rejected Petitioner's contention that all three counts relied on the same objective and intent.  Under California law, participation in a criminal street gang is a separate

offense that requires only that the defendant have the intent and objective to participate in the gang, even if he or she did not have the personal intent to commit the other specific felony offenses charged.

Ground seven implicates only the provisions of California state law.  As such, it is not properly addressed as a federal habeas claim.

## IX.    Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> > (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> >
> > (B)  the final order in a proceeding under section 2255.
>
> (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims

or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Accordingly, the undersigned recommends that the Court decline to issue a certificate of appealability.

## X.     Conclusion and Recommendations

The undersigned recommends that the Court deny the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __**March 18, 2016**__                      _____**/s/ Sheila K. Oberto**_____
                                                                    UNITED STATES MAGISTRATE JUDGE

23